This position shall issue. Please call the next case. 513-1669 Ruth Sazaki v. Rose Cole, Alameda. Counsel, you may proceed. Good morning. Good morning. May it please the Court, Mr. Duffy, I represent Petitioner Appellant Ruth Sazaki, the surviving spouse of Willie Sazaki. The issue today is was the risk presented by him sitting in a four-wheeled rolling chair greater than that faced by the general public? Can I ask a question before you get to what the issue is? What's your name? Matthew Schiff. Thank you.  They get harder as they go along. I'm on a roll. If you had trouble with that one, it would have been a bad story. Yeah. I just sit down. The facts are undisputed. Mr. Sazaki is the manager of Rosico Auto Rebuilders, a body shop, since 1946. Truman was president. He worked six days a week. He was 90 years old. Obviously, he was a hardworking man all his life, dedicated to his business. Yes. The record indicates he fell as he was attempting to sit down and the chair slid away from him. So how is that compensable? It's compensable because this chair was ancient. It had four casters, not five or six like the ones that you're sitting on. He's sitting on a concrete floor covered with tile. He reaches to sit down. He has a personal comfort of reaching for a cup of coffee, puts it in the microwave, goes to sit down, falls and hits the floor. He's 90 years old. He might not be the most spry employee in the workforce. The chair had no arms. There's nothing to reach to. It scoots across the floor. He falls and shatters his chair. This is a chair he's sitting on every day, apparently, right? Yes. How is it different than any risk anyone else faces sitting down in a chair at work? No one else that I'm aware of sits down on a caster chair with four wheels, not five or six like they've done in the last 50 years. No one is sitting on a surface that is so hard that when he falls, his hip shatters. It's not carpeted like we're sitting here today or wood. He has a greater risk than the general public. He's in an office that no one else sits in for 50 years. He's the only one who's sat there. Well, do you have any evidence in the record that demonstrates that this is a qualitatively increased risk, this four caster chair? Sure. The photographs show it. I mean, this thing is unstable. It has no back. It has no arms. Well, there's evidence of what it is, but evidence characterizing this as an increased risk, that it's more dangerous than another type of chair. It would be obvious in a chair that has arms, you can reach for arms. If a chair has more casters, then it's not going to roll over as easily as a chair that has four where it's going to be wobbly. Well, it wasn't defective. It wasn't missing a caster. It was in the condition it was designed to be in. Yes. Back in the 40s, that's the way chairs were designed. There's no requirement under our law that we show that the chair was defective. This is this whole greater risk than that of the general public. Okay? This is the finger in the air which way does the wind blow, basically. I mean, we're supposed to live in an empirical society, okay, but all these cases seem to lack that. I mean, so who is the one that's putting the finger in the air to see which way the wind is blowing? Who's responsible for doing it? Well, initially the arbitrator, and then the commission. The arbitrator had the function. The commission. Yeah. And the commission is supposed to be knowledgeable, correct? Yes. The commission is supposed to apply the correct legal standard of quantitative and qualitative risk, which they didn't do. They simply took the arbitrator's decision and said he had the wrong legal standard. We've applied the correct one. We're not going to tell you how. We're not going to mention qualitative or quantitative. We're going to say we know that this is not an increased risk. And this Court has reversed in the past where the commission has not applied the law correctly. So what was the correct law they should have applied? They should have looked at it quantitatively. How often did he have to sit in his chair? And the answer? Where's the evidence? Where's the evidence? Every single day Jimenez testified. He wouldn't call and say you come to me. He'd get up and go to Jimenez every time there's a question or an answer. He went to lunch. He was the one who brought the banking in. So that's his day. Did you testify how many times this was going on? This Court has already upheld three times a week with a dip in the road is enough in the Metropolitan Water Sanitary District. That's because there was a defined defect in the road. What's the defect here? The defect is you have an ancient chair that scoots across a linoleum covered floor. Is there a testimony that this was unreasonably dangerous? It's just the description of it in the photographs. It's ancient. Then it's up to the commission to make a determination whether they think it's dangerous or not. And if they don't think it's dangerous, you've got a problem. I mean, here's what I'm struggling with. The chair, wasn't it designed to roll across the floor easily? Wasn't that the purpose of this chair? The purpose of the chair is to sit in it and to swivel and turn, yes. So did the chair not do what it was supposed to do? Is that what the issue is here? I think the chair scooted across, which it's not supposed to do. No other chair looks like that chair. You look at that chair and you look at your chair, you're going to see a big difference. It doesn't look the same. Your chairs are safe. This chair is not. Who says? It's obvious from looking at it. It doesn't have arms. Wait a minute. Come on. It evidently wasn't obvious to the commission. There is no evidence in this record that this chair is dangerous. You've shown a picture. And then you say to the trier of fact, figure out if it's dangerous. We say it's dangerous. Look at it if it's dangerous. Is there something broken in it? It doesn't have to be defective. That would be adding a standard that doesn't need to be there. No, but you've got to have evidence that it's dangerous. His testimony, unrebutted, or what he said to the doctors and all those medical records in 30 minutes is, I reached for the chair, it scooted away, and I fell. That wouldn't happen in a workplace where you have a carpet. Why people don't fall down? They don't. In other places? They don't fall on concrete. Why not? I mean, is there some rule of physics that says people can't fall on concrete? Just fall down? People can fall down, but this is a greater risk. I mean, the commission had ten prior cases with rolling chairs where they always found it compensable. Then they decide to change on this one. I don't know why. But you can't compare this case to the other cases. You know that. You can't compare one case to another. I understand it's not going to be authority before this Court, but it's persuasive that they decided to suddenly change their way of looking at these cases. Does every one of those commission decisions have been reviewed by our Court? No. Those were commission decisions. No decisions have persuasive authority of the commission unless we've reviewed them. I understand that. I listened just to show that there was a flow of these cases. It's not like I'm the first one who ever thought that a chair with casters might be dangerous. These were routinely brought before the commission, were always found to be compensable prior to this case. I don't really understand it. There's no factual dispute as to what happens. And the quantitative aspect has been covered. It's certainly more than three times in a week. The qualitative, I think, is covered by the fact that he's on a much harder floor. If he lands on concrete at 90 years old, his hip's going to shatter. And that's what happened. Had he landed on a carpet, he might not have had the same. So you're saying the employer should have had a carpet instead of a concrete floor that he was working on all these years? If it was, there might have not been as much of an increased risk. But hold on a second. If a person is 90 years old, is walking across the concrete floor, and trips on his own shoelaces, are you going to contend that's compensable? No. Because the floor is concrete. No, because shoelaces. Okay. So now the question becomes, what's wrong with the chair? I think the photograph shows it. And I think that's where the problem in this case is. It's a failure of proof. If someone would have come in and testified, this chair in its condition is unreasonably dangerous. You don't have to do that, but you could. Then you turn around and say, ah-ha, you've exposed an employee in his workplace to a fixture that's unreasonably dangerous. And as a result of that, he's injured. He'll recover. The problem is, you left it up to the commissioner to determine whether, looking at the picture, the chair was dangerous. And I guess they decided it wasn't, because they didn't award him any money. And they did it on he wasn't exposed to any hazard greater than the general public, which is the proper standard, by the way, the legal standard. Yes, but they never talk about quantity. They never talk about the quality. They just say the arbitrator used the wrong standard. We are using the right standard. And without any discussion of facts and law, we're going to say that there's no greater risk than the general public. I can't think of anyone else in the general public who would be exposed to these conditions. The evidence shows it. See, the problem is, the commission isn't a sua sponte advocate, okay? This is an advocacy system. So it requires some advocacy. It requires some evidence, an argument. And the commission weighs it. This was like the earlier case. It was obvious to you it was an ancient chair and there were problems. But sometimes evidence has to be presented besides what is perceived to be obvious to establish the burden. You said the only evidence that was presented is that photograph which shows an ancient chair different from all other chairs with four casters instead of five, a concrete floor, and the unrebutted testimony of what happened, that he fell when he tried to sit down. Unfortunately, it wasn't obvious to the commission. Do we know, did the chair slip from under him? Did the chair fall backwards and go on the back? Do we know? What he said was he reached for it and it scooted away. Well, then the number of casters wouldn't make a difference, would it? Logically, practically. Logically. Just the fact that it's a castered chair. No. Not the number of casters. To me, logically, it would. You'd have five points of contact. Five casters means it doesn't go away, it would scoot away? It would have five points of contact with the floor instead of four points of contact with the floor. If it's a carpet, it's going to have greater friction. So you're asking us to take judicial notice or the commission to take the equivalent of judicial notice that a four-caster chair scoots across the floor faster than a five-caster chair? We only have the evidence of what happened, that he reached for it and the thing scooted away. Which is any caster chair might do. It might. Regardless of the number of casters. It might. It is an unsafe. So caster chairs are unsafe. Based on prior commission decisions, yes. Again, commission decisions don't mean anything. But I'd like you to simply consider this, and this went into evidence, and tell me if I'm wrong. At the emergency room, the decedent told medical personnel that he tripped and fell to the floor. Now, that is an odd history because it's different from every other. I don't know why. Right. But then he went on to say, we can accept this, he was attempting to sit in a chair when he fell onto the floor at his workplace. So, I mean, really, I'm not going to hold you to that inconsistency, but still, we don't really know what happened except that he went to sit in a chair, which people do all the time. And by the way, I have seen people fall off chairs that aren't caster rolling chairs. Haven't you? I mean, that happens. People miss chairs all the time, even if the chair isn't defective at all. Typically, what makes it more dangerous than a regular chair like that is that it swivels. Caster chairs normally have arms, so there's something to reach onto when you sit down. This chair, I can't, you know, they don't make them anymore. I think for a reason. Well, then you should have brought in some experts to say that or brought in somebody to say that. You're asking us to take judicial notice that this chair is ancient and it's dangerous. I mean, quite frankly, that's what you're asking us to do, substitute our judgment for that of the commission and to find that the chair had some type of a dangerous propensity. It can go either way. It can either be the chair or the fact that it's a concrete office floor, which is also not something you typically see. It's not a concrete office floor. It's dangerous, are we? Most office floors are not concrete. They're covered with something. This thing is like an industrial spot. All I'm saying is that this wasn't breaking new ground. That's what the commission had always held, is that this fact pattern was a greater  But in this case, for some reason, they decided not. And this was a more susceptible Petitioner than you would normally find, a 90-year-old man who's reaching and misses and tries to sit down in the chair and the chair scoots away because of the combination of the chair and the floor. What was the year this was decided? This was 7 oh, I'm sorry, the decision itself from the commission was 2012. 2012, and the arbitrator's decision was 2012? Arbitrator's decision was 11. 11. And this event was exactly 7 years ago. Yeah. And all these other commission decisions which we don't care about unless we've been reviewing them were before that, right? They were either before that or subsequent to that. Oh, subsequent. Okay. They are just, I went through this fact pattern. Okay. Well, if they were all before that, you probably can figure out why there's a difference. Your time is up. Thank you. Thank you. Good morning. May it please the Court, my name is Patrick Duffy. Mr. Schiff. I think the first thing I have to say is counsel says there's no dispute as to what happened. And I'm not sure what happened. I don't think the record establishes what happened. We know he was, Mr. Sasaki, who seemed like a great guy, was at work and he missed the chair. He somehow fell. But we don't know if the chair was back there when he went to sit down and missed it or if he went to sit down and he hit it with his butt and he scooted away or if he hit it with his arm. We really don't know. And unfortunately, he wasn't, he didn't live long enough to tell us. So I think counsel's representation that nothing is in dispute, I don't think is quite accurate. The counsel started talking about the concrete floors. There's no evidence that this would have been a different outcome, different injury if he had landed on carpet. He was an older man and he was susceptible to being injured, to bone fractures and hip fractures. And there's no evidence. This is the first time I've heard that the falling on concrete could have been the defect. Well, cutting to the chase, what do you make of this ancient chair argument? Well, I think two things. One, we don't know if that had anything to do with it. He may have just went to sit down and missed it, number one. Number two, it would seem to me that if it was the chair's fault, he'd have been on the chair and then something happened. He was, I don't think, ever actually on the chair immediately before he fell. Number three. The inference from the commission, and I think it's a fair inference from the evidence, is that he never really got into the chair. This happened as he was trying to sit on the chair. That's, I think there's evidence to support that. There's a whole body of medical evidence, as we all get older, that hip fractures don't occur on impact. They occur, and then we fall down by twisting. Okay. Now, that's outside the record. There's no evidence being presented by any parties there. But you can look it up yourself. Most medical general practitioners now are accepting that theory. Okay. Just a twist or a turn, as we get elderly, can fracture a hip. We lose our mobility. We fall. So it's not an impact medical condition. It's just a condition of twist, hip fracture. Okay. So the question is, should we be considering that evidence? It's outside the record. Should we take judicial notice of that? I mean, that's what I think we're struggling with is the state of the record and what's the evidence here. I don't think you need to. I don't think there is evidence of that. I don't think there's evidence of, I think both counsel and I have assumed that somehow when he fell that his right hip fractured. To my knowledge, we, there's no evidence that it was done in a twisting motion. So I don't, I'm not asking you to consider that. Well, number one, we can't. I mean, you know. Okay. Okay. But I'm just saying it's like the record is absent of a lot of things. Is that your argument? The record is absent of a lot of things. As I read the record and as I sat through the hearing before the arbitrator, I don't think we know what happened. I don't think how Mr. Sasaki wound up on the floor. He was at work and he called his employee, his co-employee. His co-employee came and somehow the chair was involved. But I don't think the condition of the chair, I don't think the condition of the floor, the fact that there was tape on the floor or anything like that, I don't think there's any evidence that any of that has anything to do with how Mr. Sasaki fell. And I think the commission got it right. The arbitrator found that Mr. Jimenez testified that when he approached Mr. Sasaki on the floor, Mr. Sasaki told him he had fallen off the chair. Correct. Which is just another version of what has happened, and that's actually inconsistent, at least the way I hear it, with going to sit down and the chair scooting away. Mr. Jimenez's testimony suggests that Mr. Sasaki was actually on the chair and somehow fell. Which is not totally consistent with the two statements that Mr. Sasaki gave. Correct. He was in the emergency room and went to his doctor. Correct. So there's three different versions now of how it happened. Correct. Those statements were not admitted in evidence, though, were they not? They were not. They were stricken on your statements? They were not. But even assuming those, there's a lot of ambiguity as to what happened, and I do not think there's sufficient evidence to even get to the fact that the chair scooted away and he fell somehow because the chair was a wild chair on forecasters. The only other comment I would like to make is that there is discussion regarding the Metropolitan Water case, and in that case you affirmed the commission. It was not a case where you were overruling the commission. You were reinstating the commission decision. Unless there are more questions, I'm done. I don't believe there are. Thank you, Counsel. Thank you. Counsel may reply. Did Mr. Jimenez's testimony of what Mr. Sasaki said when you found him come in without objection? I'm sorry, I couldn't hear you. Did Mr. Jimenez's testimony of what Mr. Sasaki told him, I fell off the chair, come in without objection? Yes. So that's the only evidence in the record that wasn't objected to as to how Mr. Sasaki fell down. No, there's also the statement that Mr. Sasaki gave to Dr. Mitzos and to Dr. DiLello, which are both women without objection. So I don't think there's any question. But that statement was? That he fell while attempting to sit down in his chair. That's what he said to Dr. DiLello and that's what he said to Dr. Mitzos. But what did he say to the gentleman who came to him? Jimenez. Jimenez. He said, I fell off the chair. Fell off the chair. So we've got two different versions. I think it's all one act of attempting to sit down. I don't think that, you know, we'd be quibbling over the specific words. We know what the instrumentality was. We know what the result was. And, you know, since this case was briefed, you came out with your decision in Villa Park where you have somebody walking downstairs. I mean, we're not quibbling over the stairs are somehow dangerous. It's just the fact that having, you know, a job that requires you to walk in a place that no one else has to go, the general public is not. By the way, he was in a debilitated condition. The man was in a debilitated condition, was forced to run up and down the stairs several times a day. I'm not sure it said run, but yeah. He had to go up and down the stairs to change his clothes. Right. To go to the roll call room. Right. For personal comfort reasons, and the same thing here. You know, you have somebody who's in a place that the general public is never going to be, his private office, and he has to, throughout the day, get up and down. He said, or Jimenez testified that it was the first time that Mr. Suzuki had ever called to him to come. He would always get up and walk over and tell Jimenez what to do. So I think, you know, you really have difficulty distinguishing the two in terms of, you know, the increased risk issue. And in the Itchery case, you know, with the IIT Research Institute, you know, the commission found that there was no increased risk, and the court reversed and said, as a matter of law, there's increased risk because it was a dangerous neighborhood and there was a shooting. I mean, it doesn't have to be, you know, a slavish adherence. And in that case, a police officer testified that he was familiar with the neighborhood and that it was a more dangerous neighborhood. In other words, there was evidence that there was a greater danger. Actually, it was my case. I have a lot of recollection. Yes. I have a lot of recollection about that. Okay. The statistics were where the death occurred was a low-risk area. And those statistics were the ones that the commission looked at. The statistics from where the bullet was shot, which was south of 35th Street, was a high-crime area. It was the commission's choice as to which stats they were going to, you know, look at, and the court said, no, there's only one answer here, and that's that it's more dangerous to the general public. So it isn't a slavish adherence to what the arbitrator and the commission find. It's still the court's determination, especially when the facts are not really in dispute, to decide that it's a matter of law. It's still a manifest weight when different inferences can be drawn. I think it's de novo because the document. The fact that the facts are undisputed does not necessarily make it de novo, if you can draw different inferences from those same facts. Agreed. Agreed. But I think it's only one reason. It's the only way to get the manifest weight and deference to it. I don't know that you have a situation where there's no dispute as to the facts and there's only one reasonable inference that makes a manifest weight. Well, you just interjected only one reasonable inference. And that's the argument I'm making, is that the reason. Your opponent would disagree with that. There's another reasonable inference. Mr. Chair. My inference is supported by what the witness has said and what the decedent said to the witnesses. There's nothing that contradicts it. Thank you. Thank you, counsel, both. This matter will be taken under advisement. This position shall issue. The court will stand in brief recess. Thank you. Thank you. Thank you.